# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA
# EASTERN DIVISION

| | |
|---|---|
| ALPS Property & Casualty Insurance Company, | ) ) ) |
| Plaintiff, | ) ) ) **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) ) Case No. 3:19-cv-00195 |
| Bredahl & Associates, P.C.; Jeff A. Bredahl, Esq.; Legacy Steel Building, Inc.; Wane Engkjer; and Bruce Engkjer, | ) ) ) ) |
| Defendants. | ) |

Before the Court is Plaintiff ALPS Property & Casualty Insurance Company's ("ALPS") motion for summary judgment filed on March 17, 2020. Doc. No. 23. The motion seeks declaratory judgment on the applicability of a Lawyers Professional Liability Policy ("Policy"). The motion asserts, among other things, that Defendant Jeff A. Bredahl, Esq. ("Bredahl") and Bredahl & Associates, P.C. ("Bredahl Firm")[1] knew or reasonably should have known or foreseen that certain acts, errors, or omissions would lead to a professional legal malpractice suit ("Legacy Suit") against them by Legacy Steel Building, Inc. ("Legacy"), Wane Engkjer ("W. Engkjer"), and Bruce Engkjer ("B. Engkjer").[2] ALPS claims that the Bredahl Defendants' knowledge of and failure to disclose the potential for suit prior to the effective date of the Policy bars coverage. The motion also seeks a determination that ALPS is entitled to reimbursement of attorneys' fees and costs related to the defense of the Bredahl Defendants in the Legacy Suit under a reservation of rights.

---

[1] Bredahl and the Bredahl Firm are collectively referred to as the "Bredahl Defendants."
[2] Legacy, W. Engkjer, and B. Engkjer are collectively referred to as the "Legacy Defendants."

On April 7, 2020, the Bredahl Defendants responded only to ALPS's reimbursement claim and notified the Court of a pending Miller-Shugart Agreement with the Legacy Defendants. Doc. No. 26. The same day, the Legacy Defendants responded to ALPS's motion on the coverage issue pursuant to the pending Miller-Shugart Agreement. Doc. No. 27. ALPS submitted a reply on April 21, 2020. Doc. No. 31. For the reasons below, the motion for summary judgment is granted.

## I.     BACKGROUND

ALPS is a Montana insurance carrier. Doc. No. 1, ¶ 1. The Bredahl Firm is a North Dakota law firm. Id. ¶ 2. Bredahl is an attorney licensed in North Dakota and is the sole owner of the Bredahl Firm. Id. ¶ 3. Legacy is a North Dakota corporation. Id. ¶ 4. W. Engkjer is the President of Legacy. Id. ¶ 5. B. Engkjer is a contractor associated with Legacy. Id. ¶ 6. A summary of the Policy is followed by the factual background and procedural history.

### A.     The Policy

ALPS issued the Policy to the Bredahl Firm effective from October 1, 2017 through October 1, 2018. Doc. No. 1-2, p. 1. The Policy has a loss inclusion date of October 1, 2016. Id. In relevant part, the Policy provides:

> THIS IS A "CLAIMS MADE AND REPORTED" INSURANCE POLICY. THEREFORE, AS A CONDITION PRECEDENT TO THE COMPANY'S OBLIGATION TO DEFEND OR INDEMNIFY THE INSURED UNDER THIS POLICY, THE INSURED MUST IMMEDIATELY REPORT ANY CLAIM TO ALPS DURING THE POLICY PERIOD OR DURING ANY APPLICABLE EXTENDED REPORTING PERIOD.
>
> * * *
>
> 1.1 COVERAGE
>
> Subject to the Limit of Liability, exclusions, conditions and other terms of this Policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the Deductible amount) that the Insured becomes legally obligated to pay as Damages, arising from or in connection with A CLAIM FIRST MADE

AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY DURING THE POLICY PERIOD, provided that:

1.1.1 the Claim arises from an act, error, omission or Personal Injury that happened on or after the Loss Inclusion Date and the Retroactive Coverage Date set forth in Items 2 and 3 of the Declarations, and that the Claim arises from or is in connection with:

(a) an act, error or omission in Professional Services that were or should have been rendered by the Insured, or

(b) a Personal Injury arising out of the Professional Services of the Insured;

1.1.2 at the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the act, error, omission or Personal Injury might be the basis of a Claim. . . .

1.2 DEFENSE AND CLAIM EXPENSES

1.2.1 For any Claim covered under this Policy, the Company shall have the right and the duty to defend such Claim even if any or all of the allegations of the Claim are groundless, false or fraudulent. The Company shall have the right to appoint counsel to provide the defense, after consultation with the Insured, when practicable (consultation with any one Insured, in the Company's sole discretion, being sufficient), and shall pay Claim Expenses in accordance with the terms of this Policy. The Company shall not have a duty to defend or to pay such expenses as to any Claim not covered under this Policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims.

* * *

3.1 THIS POLICY DOES NOT APPLY TO . . . :

3.1.5 ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny act, error, omission or Personal Injury that occurred prior to the Effective Date of this Policy, if . . . [p]rior to the Effective Date of this Policy, any Insured gave or should have given, to any insurer, notice of a Claim or potential Claim arising from the act, error, omission, or Personal Injury, or from any act, error, omission, or Personal Injury in Related Professional Services.

Id. at 5-6, 12.

**B.     Factual Background**

The underlying lawsuit involves a dispute between the Legacy Defendants and Elite Inspection Services, Inc. ("Elite"), in which Elite alleged that Legacy breached a contract to construct a steel structure ("Elite Suit").  Doc. No. 1-4.  The Legacy Defendants first hired attorney Paul Oppegard to represent them in the Elite Suit, but after a personal dispute between Oppegard and W. Engkjer, Oppegard's representation ceased.  Doc. No. 29-3 at 76:6-77:3.  W. Engkjer then approached Bredahl to represent the Legacy Defendants in the Elite Suit.  Doc. No. 29-1 at 42:2-14.[3]  Bredahl accepted a $5,000.00 payment from W. Engkjer and Legacy for legal services in the form of a check dated October 1, 2015.  Doc. No. 29-7 at 8:9-9:11.  That notwithstanding, neither Bredahl nor any other attorney from the Bredahl Firm was formally entered as attorney of record in the Elite Suit.  Doc. No. 28-9.  Bredahl asserts that he represented Legacy on a limited basis.  Doc. No. 29-1 at 40:1-7, 42:2-14.  However, Bredahl did not follow the North Dakota Rules of Professional Conduct governing limited representation, namely, Rule 1.2(c).  Id. at 40:8-41:23.

Bredahl made appearances in Williams County District Court on December 30, 2015 and February 26, 2016.  Id. at 42:2-14, 44:21-45:6.  Although Bredahl was not formally identified on the docket as legal representative of the Legacy Defendants, Bredahl was directly contacted by the clerk of court prior to the February 26, 2016 hearing to connect him to the proceedings.  Id. at 44:11-20.  At each of these appearances, Bredahl asserts he informed both the court and counsel for Elite that he did not represent the Legacy Defendants.  Id. at 45:17-23, 57:7-18.  Bredahl was under the impression his involvement in the Elite Suit would cease after the February 26, 2016 hearing.  Id. at 61:15-66:17.  Despite that, no one else involved in the Elite Suit was under the

---

[3] Bredahl asserts that his representation was only for two limited appearances.  Doc. No. 29-1 at 39:22-40:12.

4

same impression. The Legacy Defendants still believed Bredahl was handling the matter for them and did not seek other legal representation. Doc. No. 29-3 at 279:15-25. Counsel for Elite continued to include Bredahl and the Bredahl Firm in filings and service documents. Doc. Nos. 28-9, 29-1 at 62:18-65:13. Bredahl never filed a formal withdrawal notice or a written consent for the purported limited representation arrangement. Doc. No. 29-1 at 40:8-41:23. And there is no indication that the court was aware of Bredahl's understanding of his role. Doc. Nos. 28-10, 28-12, 28-13. Additionally, the court included Bredahl in its order granting Elite's motion to compel discovery in August 2016 and listed him as counsel for the Legacy Defendants in its March 3, 2016 Notice of Trial. Doc. Nos. 28-11, 28-12.

On July 14, 2016, Elite filed a motion to compel discovery. Doc. No. 28-26. Neither the Legacy Defendants nor Bredahl responded to the motion, and the court granted the motion on August 10, 2016. Doc. No. 28-10. The motion and order were served via Odyssey, the North Dakota state court electronic filing system, and Bredahl is specifically named on the service documents. Doc. Nos. 28-11, 28-24. Bredahl claims that because he was not formally entered in Odyssey as the attorney of record, he did not receive these documents. Doc. No. 28-9. However, Bredahl admitted to receiving documents in the Elite Suit which were served electronically, including the Notice of Trial that was sent via e-service on March 3, 2016. Doc. Nos. 28-12, 29-1 at 57:19-58:9.

On Wednesday, March 8, 2017, the Bredahl Defendants received an email from the Williams County clerk of court inquiring whether the case was proceeding to trial, which was scheduled to begin on Monday, March 13, 2017. Doc. No. 28-13. A few minutes later, the clerk of court sent a follow up email stating, "My apologies, I do see that your firm has withdrawn from this case." Id. On Friday, March 10, 2017, Bredahl contacted W. Engkjer to wish him luck in the

5

trial scheduled for the following Monday.  Doc. No. 29-1 at 79:12-17.  W. Engkjer replied that he was unaware of the trial, and Bredahl then asked W. Engkjer to come to the Bredahl Firm.  Id.  W. Engkjer met with Bredahl later that same day to discuss the trial.  Doc. No. 29-3 at 280:1-3.  When the meeting occurred, W. Engkjer believed Bredahl was representing him, B. Engkjer, and Legacy at the trial.  Id. at 279:15-25.

After the meeting with W. Engkjer, Bredahl contacted attorney Blake Hankey ("Hankey") to assist in preparing a motion to continue the trial.  Doc. No. 29-1 at 85:22-86:4.  Hankey agreed to take the case on the condition that the motion to continue would be granted because he would need time to prepare for trial and was unable to be in Williston for the trial on Monday.  Doc. No. 29-2 at 29:25-30:5.  As a result, Hankey and the Bredahl Firm prepared a motion to continue.  Id. at 23:1-23:17.[4]  Hankey filed the motion to continue that same day, March 10, 2017.  Doc. No. 28-15.

On March 13, 2017, the court denied the motion to continue, noting that the inattentiveness of counsel was not sufficient justification to continue the trial.  Doc. No. 28-15.  The order was served on March 22, 2017 via the electronic filing system.  Doc. No. 28-14.  The trial proceeded as scheduled on March 13, 2017—without Bredahl, Hankey, or the Legacy Defendants present.  The court entered judgment in the amount of $1,035,538.81 against the Legacy Defendants.  Doc. No. 28-16.  According to W. Engkjer, Bredahl made no efforts to follow up with the Legacy Defendants as to the resolution of the motion to continue or the trial.  Doc. No. 29-3 at 312:2-10.[5]  W. Engkjer believed that the attorneys had taken care of things and that the trial had not happened.

---

[4] There is some dispute over the veracity of the affidavits attached to the motion to continue.  These disputes need not be resolved as they involve facts that are not material for purposes of deciding the coverage issues ALPS has raised under the Policy.
[5] W. Engkjer had at least one conversation with Hankey on the morning of March 13, 2017 related to the denial of the motion to continue.  Doc. No. 29-2 at 37:19-38:3.

6

Id. at 308:2-8.  Bredahl, on the other hand, claims he informed W. Engkjer of the judgment and advised him to retain new counsel to try to vacate the judgment.  Doc. No. 29-1 at 101:10-102:22.

W. Engkjer became aware of the judgment in the Elite Suit in the first week of October 2017 in a phone call from his nephew.  Doc. No. 29-3 at 185:2-13.[6]  W. Engkjer called the Bredahl Firm and left a voicemail the same day.  Id. at 188:9-189:2.  Sometime in October 2017, Gary Smith, a Legacy employee, went to the Bredahl Firm seeking information and files related to the Elite Suit.  Doc. No. 29-7 at 28:22-30:7.  After further litigation, the Legacy Defendants were eventually able to settle the Elite Suit.  Doc. No. 28-20.

The Bredahl Defendants submitted a renewal application for the Policy to ALPS on July 20, 2017.  Doc. No. 23-2, p. 2.  In early October 2017, the Bredahl Defendants completed the application, which included individual attorney supplements.  Doc. No. 23-3.  The application contained several questions related to potential liabilities.  Id.  The Bredahl Firm answered in the negative to the following question:

> Are you or any member of the firm aware of or do you or any member of your firm have knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against any current or former attorney in the firm or its predecessors, regardless of the merit of such claim that has not already been reported to ALPS?

Id. at 2.  Additionally, in Individual Attorney Supplements, Bredahl and the other attorneys at the Bredahl Firm each answered in the negative to the following question:

> Are you aware of or do you have knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against you, regardless of the merit of such claim?

---

[6] The exact date W. Engkjer was informed of the judgment is unclear.  However, he was attending the Fryeburg Fair in Fryeburg, Maine, which took place from October 1 to October 8, 2017.  Doc. No. 29-3 at 187:5-7.

Id. at 5-7.  After discussions between the Bredahl Firm and ALPS related to policy limits, the Policy was accepted on October 25, 2017.  Doc. No. 23-7.

In January 2018, ALPS became aware of a potential claim against the Bredahl Defendants related to the Elite Suit.  Doc. No. 23-2, p. 4.  On April 19, 2018, ALPS sent the Bredahl Defendants a reservation of rights letter.  Doc. No. 23-8.  In March 2019, the Legacy Suit against the Bredahl Defendants began.  Doc. No. 28-21.  On September 4, 2019, ALPS sent an acceptance of defense letter, containing a second reservation of rights, to the Bredahl Defendants.  Doc. No. 23-10.  On September 12, 2019, ALPS initiated the present action against the Bredahl Defendants and the Legacy Defendants to determine coverage.  Doc. No. 1.

## II.     LEGAL STANDARD

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248).  Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)).  "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249).  If

the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

The parties agree North Dakota law controls. Accordingly, the Court will apply North Dakota Supreme Court precedent and attempt to predict how that court would decide any state-law questions it has yet to resolve. See Stuart C. Irby Co., Inc. v. Tipton, 796 F.3d 918, 922 (8th Cir. 2015).

"Insurance policy interpretation is a question of law." Forsman v. Blues, Brews & Bar-B-Ques, Inc., 2017 ND 266, ¶ 10, 903 N.W.2d 524 (citing K & L Homes, Inc. v. Am. Family Mut. Ins. Co., 2013 ND 57, ¶ 8, 829 N.W.2d 724). The North Dakota Supreme Court has consistently explained its approach to interpreting insurance policies this way:

> We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract. While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.

Borsheim Builders Supply, Inc. v. Manger Ins., Inc., 2018 ND 218, ¶ 8, 917 N.W.2d 504 (citation omitted). The basic task is to determine if the insurance policy's affirmative coverage provisions apply, and if so, to then look at whether any exclusions bar coverage. "It is axiomatic that the burden of proof rests upon the party claiming coverage under an insurance policy." Forsman, 2017 ND 266, ¶ 12, 903 N.W.2d 524 (citation omitted). "If and only if a coverage provision applies to

9

the harm at issue will the court then examine the policy's exclusions and limitations of coverage." Borsheim Builders, 2018 ND 218, ¶ 9, 917 N.W.2d 504 (citation omitted).

The complaint seeks a declaration that ALPS holds no duty to defend or indemnify the Bredahl Defendants in the Legacy Suit. The duties to defend and indemnify "are two separate and distinct contractual obligations . . . determined by applying different standards." Tibert v. Nodak Mut. Ins. Co., 2012 ND 81, ¶ 33, 816 N.W.2d 31 (citing Hanneman v. Cont'l W. Ins. Co., 1998 ND 46, ¶ 39, 575 N.W.2d 445). "An insurer's duty to defend is broader than [the] duty to indemnify." Id. ¶ 30 (citing Farmers Union Mut. Ins. Co. v. Decker, 2005 ND 173, ¶ 14, 704 N.W.2d 857). Corollary to that principle, if there is no duty to defend, there is no duty to indemnify. See Selective Ins. Co. of Am. v. Smart Candle, LLC, 781 F.3d 983, 985 (8th Cir. 2015) (citations omitted). "An insurer does not have a duty to defend an insured if there is no possibility of coverage under the policy." Decker, 2005 ND 173, ¶ 14, 704 N.W.2d 857 (citing Schultze v. Cont'l Ins. Co., 2000 ND 209, ¶ 8, 619 N.W.2d 510). "Any doubt about whether a duty to defend exists must be resolved in favor of the insured." Tibert, 2012 ND 81, ¶ 31, 816 N.W.2d 31 (citations omitted).

### III. DISCUSSION

ALPS's motion raises two distinct issues. First, ALPS claims it does not have a duty to defend or indemnify the Bredahl Defendants under the Policy. ALPS posits several theories in support of this assertion, but the Court need only address whether the Bredahl Defendants knew or reasonably should have known or foreseen that the circumstances underlying the Legacy Suit might be the basis of a claim. Second, if the claim is not covered, then ALPS contends that section 1.2.1 of the Policy requires the Bredahl Defendants to reimburse ALPS for defense costs.

#### A. The Policy Does Not Provide Coverage for the Legacy Suit.

As a condition of coverage, the Policy provides:

10

> 1.1.2 at the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the act, error, omission or Personal Injury might be the basis of a Claim.

Doc. No. 1-2, p. 6.  Further, the Policy excludes from coverage:

> 3.1.5 ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny act, error, omission or Personal Injury that occurred prior to the Effective Date of this Policy, if . . . [p]rior to the Effective Date of this Policy, any Insured gave or should have given, to any insurer, notice of a Claim or potential Claim arising from the act, error, omission, or Personal Injury, or from any act, error, omission, or Personal Injury in Related Professional Services.

Id. at 12.  No one disputes that the Legacy Suit arose from events occurring prior to October 1, 2017.

Although there is a dearth of North Dakota case law construing similar policy language, federal courts typically employ a hybrid subjective-objective test most prominently articulated in Colliers Lanard & Axilbund v. Lloyds of London, 458 F.3d 231 (3d Cir. 2006).  The Colliers test encompasses two parts.  The first part looks to whether the insured had subjective awareness of an act, error, or omission.  Id. at 237.  If so, then the second part calls for an objective inquiry to determine "whether a reasonable professional in the insured's position might expect a claim or suit to result."  Id.  Under this second prong, the insured's subjective expectation of a lawsuit is irrelevant.  Id.  "As other courts have noted, this language instructs the court to first look at the insured's subjective knowledge and then the objective understanding of a reasonable attorney with that knowledge."  City of Brentwood v. Northland Ins. Co., 397 F. Supp. 2d 1143, 1148 (E.D. Mo. 2005) (cleaned up); see also Platte River Ins. Co. v. Baptist Health, No. 4:07cv0036 SWW, 2009 WL 2015102, at *13 (E.D. Ark. Apr. 17, 2009) ("Under this inquiry, courts first ask the subjective question of whether the insured knew of certain facts and then ask the objective question of whether such facts could reasonably have been expected to give rise to a claim.").

Under the first prong of the Colliers test, Bredahl unquestionably possessed subjective knowledge of the underlying events that led to the Legacy Suit before October 1, 2017. Bredahl accepted a $5,000.00 check from Legacy for representation in the Elite Suit. He then made two appearances in the matter before the Williams County District Court on December 30, 2015 and February 26, 2016. Although Bredahl purportedly told the court and opposing counsel that he did not represent the Legacy Defendants during those appearances, he never filed a formal withdrawal notice or a written consent for the purported limited representation arrangement. And after the February 26 hearing, Bredahl continued to receive electronic filings with his firm consistently listed as the Legacy Defendants' counsel. Those filings included an order compelling discovery and a notice setting the trial for March 13, 2017. The Friday before the trial, on March 10, 2017, Bredahl and W. Engkjer met at the Bredahl Firm and discussed the trial. Bredahl then worked with Hankey on a motion to continue the trial. Bredahl knew that the motion to continue was denied and that neither he nor Hankey was in Williston for trial on March 13, 2017. Finally, Bredahl knew in March 2017 that the court entered a more than $1.03 million judgment against the Legacy Defendants. These facts plainly demonstrate Bredahl's subjective knowledge of the events from the Elite Suit that resulted in the Legacy Suit. Thus, the first prong of the Colliers test is satisfied.

Addressing the second prong, a reasonable attorney in Bredahl's position would have known of the potential for a malpractice claim arising from the events in the Elite Suit. An attorney's failure to appear at a scheduled trial that results in an adverse judgment against a client presents a clear basis for a malpractice claim. See Schwartz Manes Ruby & Slovin, L.P.A. v. Monitor Liab. Managers, LLC, 483 F. App'x 241, 246 (6th Cir. 2012). Bredahl maintains that he did not represent the Legacy Defendants in the Elite Suit after February 26, 2016. But whatever

Bredahl's personal beliefs may have been, the combined effect of his actions and inactions left him in the untenable position of—at minimum—appearing to all involved that he represented the Legacy Defendants in the Elite Suit through trial. Upon entry of judgment against the Legacy Defendants after no one appeared at the trial, a reasonable attorney in the same position would have recognized the potential for a resulting malpractice claim.

Because Bredahl should have known of a potential malpractice claim arising from his representation of the Legacy Defendants in the Elite Suit before October 1, 2017, section 1.1.2 of the Policy unambiguously bars coverage. For similar reasons, section 3.1.5 excludes coverage because the Bredahl Defendants should have given notice of the potential claim prior to the Policy's effective date. Therefore, ALPS does not have a duty to defend or indemnify the Bredahl Defendants in the Legacy Suit.

### B. The Policy Requires the Bredahl Defendants to Reimburse ALPS.

With coverage resolved, the Court next turns to whether ALPS is entitled to reimbursement for defense costs expended on the Bredahl Defendants' behalf in the Legacy Suit. The Policy states:

> [ALPS] shall not have a duty to defend or to pay such expenses as to any Claim not covered under this Policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims.

Doc. No. 1-2, p. 6. An insurer can maintain a right to reimbursement for attorney's fees and costs when the insurer has adequately reserved its right to reimbursement. Knapp v. Commonwealth Land Title Ins. Co., Inc., 932 F. Supp. 1169, 1172 (D. Minn. 1996). A reserved right to reimbursement becomes enforceable when a court determines there is no duty to defend. St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp., 457 F.3d 766, 773 (8th Cir. 2006).

13

Both the Bredahl Defendants and the Legacy Defendants contest ALPS's right to reimbursement under the Policy. ALPS points to section 1.2.1 of the Policy as creating this right. Doc. No. 1-2, p. 6. Further, ALPS sent Bredahl and the Bredahl Firm a letter reserving its right to reimbursement under the Policy on September 4, 2019. Doc. No. 23-10. The letter stated:

> By agreeing to provide a defense under the Policy subject to a full reservation of rights, ALPS is not waiving any rights it has under the Policy or otherwise existing at law, including, but not limited to, the rights to pursue a judicial declaration of ALPS's rights and obligations under the Policy and to seek reimbursement of any and all claim expenses paid by ALPS in defending the Claim.

Doc. No. 23-10.

The North Dakota Supreme Court has not addressed an insurer's right to reimbursement of defense costs when the reimbursement provision is contained in the policy and the insurer has reserved its right under the policy. As a source of persuasive authority, the Defendants rely on Westchester Fire Insurance Company v. Wallerich, 563 F.3d 707 (8th Cir. 2009), for their argument that the Eighth Circuit Court of Appeals has rejected an insurer's right to reimbursement in these circumstances. But Westcheseter confirms the opposite. In that case, the Eighth Circuit held that the insurer did not have a right to reimbursement because there was no such right in the insurance policy and the insurer only mentioned reimbursement in a reservation of rights letter. Id. at 719. Still, the court indicated that the outcome would have been different if the insurer had "included in the policy an express provision for such reimbursement." Id. Here, the Policy does just that by setting out a right of reimbursement for defense costs in section 1.2.1, which specifically states that ALPS "shall have the right to seek reimbursement from any Insured . . . for any amount paid by the Company in defending any such non-covered Claim." Doc. No. 1-2, p. 6. Moreover, ALPS did, in fact, reserve this right in the September 4, 2019 letter to Bredahl and the Bredahl Firm. The Bredahl Defendants then accepted the defense ALPS

14

tendered subject to that reservation.  Consequently, the plain language of the Policy requires the Bredahl Defendants to reimburse ALPS for defense costs related to the Legacy Suit.

## IV.   CONCLUSION

No genuine issues of material fact remain, and ALPS is entitled to judgment as a matter of law.  The Court has reviewed the record and the relevant legal authority.  For the reasons above, ALPS's motion for summary judgment (Doc. No. 23) is **GRANTED**.  The Policy does not provide coverage to the Bredahl Defendants for the Legacy Suit.  As a result, ALPS has no duty to defend or indemnify the Bredahl Defendants.  Finally, ALPS is entitled to an award against the Bredahl Defendants for attorneys' fees and costs expended on their behalf to defend against the Legacy Suit.  Considering the comprehensive briefing submitted, Legacy's motion for hearing (Doc. No. 30) is **DENIED**.

**IT IS SO ORDERED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated this 23rd day of October, 2020.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court